UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GERALD MINER, et al.,           )
                                      )
           Plaintiffs,              )
                                      )
          v.                     )       Case No. 4:19-CV-95-SPM
                                      )
CURTIS SCHRIEBER, et al.        )
                                      )
          Defendants.          )

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Curtis Schrieber ("Schrieber") and Mercantile Capital Inc. ("Mercantile") (Doc. 92). Briefing on the motion is complete.[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 20). For the reasons stated below, the motion will be granted in part and denied in part.

### I.     LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material

---

[1] Plaintiffs filed a brief in opposition to the motion, and the time to file a reply has expired.

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, then the burden

shifts to the nonmovant to submit evidentiary materials that "designate specific facts showing that

there is a genuine issue for trial." *Id.* at 324. An issue of fact is genuine, making summary judgment

inappropriate, when "a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a

court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen*

*Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court

should not weigh the evidence, make credibility determinations, or attempt to determine the truth

of the matter." *Id.* (internal quotation marks omitted).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Gerald Miner ("Miner") is the sole member of Plaintiff Adoria-Adorian

Investments, LLC ("Adoria-Adorian"). Def.'s Statement of Uncontroverted Material Facts

("SUMF"), Doc. 94, ¶¶ 2-3. Schrieber is an employee or representative of Mercantile. This case

involves two mortgage loans provided by Mercantile to Plaintiffs to refinance or purchase several

pieces of real property. The first is a $62,000 loan that was provided to refinance four properties

(collectively, the "Rental Properties"): 5311 Elsie Avenue, Ferguson, MO, 63135; 5328 Bermuda

Drive, St. Louis, MO 63121; 6149 Jefferson Avenue, St. Louis, MO 63134; and 8950 Higginson

Drive, St. Louis, MO, 63121. SUMF ¶¶ 6-13. The second is a $160,000 loan that was provided to

finance the purchase of 132 Grotto Court, Florissant, Missouri (the "Grotto Property"). SUMF

¶¶ 4-5, 14-20. When Miner purchased the Grotto Property, he intended to move into it and intended

that it would be his primary residence. Pl.'s Ex. A, Doc. 109-1, Affidavit of Gerald Miner, April

2

27, 2020 ("Miner Aff.") ¶¶ 12, 19; Pl.'s Ex. B, Doc. 109-2, Deposition of Gerald Miner, November 21, 2019 ("Miner Dep.") 131: 9:17-20, 131:21-23; 132:2-7; 143:21-25; 144:22-25; 145:1-3.

In September 2017, Defendants approached Miner to provide funding for the five properties he was getting ready to purchase or refinance, including the Grotto Property. Miner Aff. ¶ 5. After Miner sent Schrieber an email asking about his financing services, Schrieber contacted Miner by telephone sometime in September 2017 and told Miner that Schrieber could handle his commercial transactions, get rid of his private mortgage insurance ("PMI"), and get Miner a lower interest rate on a home he was looking to purchase. *Id.* ¶¶ 6, 8-9. Miner had previously obtained an offer of financing from USA Mortgage that included PMI. Miner Aff. ¶ 14. Schrieber was aware of the interest rates USA Mortgage had quoted Miner, because Miner sent the rates to Schrieber. *Id.* ¶ 11. Miner told Defendants, repeatedly, that he intended for the Grotto Property to be his primary residence. *Id.* ¶ 19.

On September 25, 2017, Schrieber sent Miner two emails. In the first, Schrieber sent a summary of terms and conditions for the $160,000 loan for the purchase of the Grotto Property; the first line of the summary states, "Loan: Commercial/Rental Property Rehab," and the email describes a loan with a 15% interest rate and payments of $2,401.40 per month. SUMF ¶¶ 4, 5; Def's Ex. B, Doc. 94-2. In the second, Schrieber sent a summary of the terms and conditions for the $62,000 loan to refinance the Rental Properties; the first line of the summary states, "Loan: Commercial/Rental Property Rehab," and the email describes a loan with a 15% interest rate and payments of $1,049.31 per month. SUMF ¶¶ 6-7; Def.'s Ex. C, Doc. 94-3. It is unclear whether these emails were sent before or after the September telephone call.

The day before the closing on the Rental Properties,[2] Schrieber told Miner to go ahead and sign the documents even though there was information in there that was false, and that "everything would be worked out later"; Miner took this to mean that he would later get the deal he had been promised orally, which had lower interest rates with no PMI. Miner Aff. ¶¶ 15, 29, 30.

On October 16, 2017, Adoria-Adorian and Miner executed a $62,000 promissory note in favor of Mercantile, and Adoria-Adorian executed a Deed of Trust and Security Agreement listing the Rental Properties as collateral. SUMF ¶¶ 8, 11-13; Def.'s Ex. D, Doc. 94-4; Def.'s Ex. E, Doc. 94-5. The heading of the promissory note states, "COMMERCIAL PROMISSORY NOTE." SUMF ¶ 9, Def.'s Ex. D. Paragraph 7 of the $62,000 promissory note states, in part, "The proceeds of this Note are to be used for business, commercial, investment or similar purposes and no portion thereof shall be used for personal, family, or household uses." SUMF ¶ 10; Def.'s Ex. D, ¶ 7. The promissory note describes a loan with 15% interest and monthly payments of $1,049.31 per month. Def.'s Ex. D, ¶ 1(a)-(b). The first page of the Deed of Trust and Security Agreement states, "A. Beneficiary has made a commercial loan (the "Loan") to Borrower, which is evidenced by that certain Commercial Promissory Note of Borrower . . ." SUMF ¶ 13; Def.'s Ex. E, ¶ A.

On October 27, 2017, Adoria-Adorian and Miner executed a $160,000 promissory note in favor of Mercantile, and Miner executed a Deed of Trust and Security Agreement on the Grotto Property. SUMF ¶¶ 14-18; Def.'s Ex. F, Doc. 94-6; Def.'s Ex. G, Doc. 94-7. The heading of the

---

[2] In an affidavit, Miner states that this occurred "the day prior to the closing of the properties." Miner Aff. ¶ 29. There were two closing dates—one for the Rental Properties on October 16, 2017, and one for the Grotto Property on October 27, 2017. The use of the plural "properties" suggests that this statement was made the day before the closing on the Rental Properties (which occurred before the closing on the Grotto Property).

promissory note states, "COMMERCIAL PROMISSORY NOTE." SUMF ¶ 15; Def.'s Ex. F. Paragraph 7 of the $160,000 promissory note states, in part, "The proceeds of this Note are to be used for business, commercial, investment or similar purposes and no portion thereof shall be used for personal, family, or household uses." SUMF ¶ 16; Def.'s Ex. F, ¶ 7. The promissory note describes a loan with a 15% interest rate and monthly payments of $2,401.40. Def.s' Ex. F, ¶ 1(a)-(b). The first page of the Deed of Trust and Security Agreement states, "A. Beneficiary has made a commercial loan (the "Loan") to Borrower, which is evidenced by that certain Commercial Promissory Note of Borrower . . ." SUMF ¶ 18; Def.'s Ex. G. Paragraph 1.1(c) also states, "Grantor represents and warrants to Trustee and Beneficiary that the Mortgage Property is commercial rental property and not the Grantor's primary home." SUMF ¶ 19; Def.'s Ex. G.

At the time of closing, Miner did not go through each page of the documents. Miner Dep. 141:4-17. He did not read the parts of the Promissory Note or the Deed of Trust and Security Agreement for the Grotto Property stating that the loan was a commercial loan and was to be used for personal, family, or household uses. Miner Dep. 143:16-20; 145:18-25; 146:1-25; 147:1-4. Miner relied on Schrieber's statement that they would get it worked out later. Miner Aff. ¶¶ 30-31. After the closing, Miner found out that what Schrieber had said about the favorable terms of his financing was not true, that Miner was paying a higher interest rates on the properties than he understood his deal with Defendants to be, that Miner's home had been classified as a commercial property, and that Miner was paying for a commercial loan that had a significantly higher interest rate than a than a home loan would have had. Miner Aff. ¶¶ 10, 16, 31.

Plaintiff did not move into the Grotto Property immediately at the time of the closing. At

5

the time of the closing in 2017, Miner was living at his previous address (with Melinda Haskins, to whom he became engaged in 2018), because the Grotto Property had to be rehabbed. Miner Dep. 10:7-19, 11:12-18, 131:211-25; 132:1-7. However, Miner later moved into the Grotto Property and was living there at the time of his November 2019 deposition. Miner Dep. 9:19-20, 10:20-23. The utilities at the Grotto are in Melinda Haskins' name, not Miner's name. SUMF ¶¶ 36-37.

On April 3, 2018, Miner emailed Schrieber to ask whether Schrieber could provide financing for Miner's girlfriend to purchase a piece of property. Pl.'s Ex. C., Doc. 109-3. In an email, Schrieber replied, "I thought your girlfriend was going to move into Grotto with you? Has the original plan changed?" *Id.*

At some point after entering the October 2017 loan transactions with Mercantile, Miner entered into agreements to sell or refinance all four Rental Properties, with closings set to take place on November 12, 2018. Miner Aff. ¶¶ 21, 23. On October 17, 2018, Miner requested that Schrieber prepare payoff figures for the Rental Properties. Miner Aff. ¶ 21.[3] Schrieber told Miner on the phone that he would only provide closing documents for transactions he approved of, and he did not approve the requested transaction and thus would not provide payoff information. Miner Aff. ¶¶ 33-34. Miner states that "[o]n November 12, 2018, Curtis Schrieber did not provide me the

---

[3] Defendants have also submitted evidence that on October 16, 2018, Defendants sent an email to a title company concerning the 5328 Bermuda Drive property that contained a payoff figure for the $62,000 loan. SUMF ¶ 40, Def's Ex. U, Doc. 94-20. It unclear to the Court from the parties' submissions why Defendants sent an email with a payoff figure for this property on that date or how that email relates to the rest of the timeline of relevant events.

payoff figures I requested, and I was not able to close on the property as a result of lacking this necessary information." Miner Aff. ¶ 24. Miner also states that "[o]n November 16, 2018, Curtis Schreiber provided a payoff quote that was inaccurate and incorrect; this caused a delay in securing alternative funding to close the property." Miner Aff. ¶ 25. Miner also states that he was thus forced to negotiate with Schrieber in order to get payoff amounts, causing him to lose money from the lost opportunities caused by Schrieber's interference in his real estate transactions with a third party. *Id.* at ¶ 35.

Despite the above issues, Miner did sell some of the Rental Properties on November 12, 2018: on November 12, 2018, Adoria-Adorian conveyed two of the Rental Properties to separate individuals through General Warranty Deeds. SUMF ¶¶ 41-42; Def.'s Ex. V, W. Additionally, at some point, Miner paid off the October 27, 2017 $160,000 promissory note that was secured by the Grotto Property. SUMF ¶ 38. On May 10, 2019, a deed of release was recorded on the deed of trust for the Grotto Property. SUMF ¶ 39, Ex. T.

In the Amended Complaint, Plaintiffs assert five claims against Defendants: (I) Violations of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010, *et seq.*; (II) Fraudulent Misrepresentation; (III) Declaratory Judgment; (IV) Tortious Interference with Business Expectancy and Contract; and (V) Punitive Damages as to Count IV. Defendants also filed a Counterclaim, asserting that Plaintiffs breached both the Promissory Note for the Rental Properties and the Promissory Note for the Grotto Property.

### III.   DISCUSSION

Defendants argue that they are entitled to summary judgment on each of Plaintiffs' claims against them. The Court considers each claim in turn.

### A.   Count I: Violations of MMPA

In Count I, Plaintiffs allege that Defendants violated the MMPA in several ways, including by unfairly placing Miner into a loan without considering his ability to repay it; by categorizing the loan for the Grotto Property as a commercial/business loan; by failing to provide payoff figures when requested; by charging more interest and fees than are allowed by law under Mo. Rev. Stat. §§ 408.030 and 408.052; and by, after coming to an agreement to provide residential financing, providing a Commercial Promissory Note at closing. Am. Compl. ¶ 39.

To prevail on an MMPA claim, a plaintiff must prove that he or she "(1) purchased merchandise (which includes services) from [Defendants]; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the Merchandising Practices Act." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016) (citing *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773 (Mo. 2007)). *See also* Mo. Rev. Stat. § 407.025.1 ("Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action . . .."). "Whether a plaintiff purchased a good for primarily a personal, family, or household purpose is a question of fact." *Kerr v. Vatterott Educ. Ctrs., Inc.*, 439 S.W.3d 802,

810–11 (Mo. Ct. App. 2014).

Defendants argue that they are entitled to summary judgment on Plaintiffs' MMPA claim because Miner did not purchase the Grotto Property for personal, family, or household purposes. Defendants' position that Plaintiffs did not purchase the Grotto Property for personal use is supported primarily by the promissory note, signed by Miner, stating, "The proceeds of this Note are to be used for business, commercial, investment or similar purposes and no portion thereof shall be used for personal, family, or household uses," and the Deed of Trust and Security Agreement, which states, "Beneficiary has made a commercial loan (the "Loan") to Borrower . . . ," and "Grantor represents and warrants to Trustee and Beneficiary that the Mortgage Property is commercial rental property and not the Grantor's primary home." [4]

Plaintiffs do not dispute that Miner signed documents indicating that this loan was for commercial purposes. However, they have also produced an affidavit indicating that Miner intended to buy the Grotto Property to use as his personal home; that Miner repeatedly told Schrieber that he was buying the Grotto Property to be his home; that Schrieber told Miner to sign the documents despite the incorrect statements in them and that things would be worked out later; that Miner did not read the documents before signing them; and that Miner did move into the Grotto Property. Miner's statements that he bought the Grotto Property for personal use and

---

[4] Defendants also appear to suggest that Miner could not have purchased the Grotto Property for personal use because the it needed extensive rehab work at the time of closing and could not be occupied by Plaintiff. However, it is unclear to the Court why a person could not have purchased, for personal use, a property that needed rehab work before it could be lived in. Miner acknowledged that he did not live in the property at the time of the October 2017 closing, because it needed work, but stated that he moved into the property in 2018.

informed Schrieber that he did so is also supported by documentary evidence: an email from Schrieber to Miner a few months after the purchase indicating that Schrieber "thought [Miner's] girlfriend was going to move into Grotto with [Miner]" and asking whether the fact that Miner's girlfriend was seeking financing for another home indicated that the "original plan" had changed. A reasonable factfinder could conclude from this evidence that Miner purchased the Grotto Property for personal, family, or household use.

Because Defendants have not meet their burden of showing that there is no genuine issue of material fact with regard to whether Miner bought the Grotto Property for personal, family, or household purposes, and because Defendants do not identify any other basis on which the Court should grant summary judgment in their favor on the MMPA claim, the motion will be denied with respect to Count I.

### B.  Count II: Fraudulent Misrepresentation

In Count II (Fraudulent Misrepresentation), Plaintiffs allege that Defendants made various misrepresentations and/or omissions related to Miner's loan or loans. Specifically, they allege that Defendants "misrepresented the ability of Plaintiffs to repay" the loan, "charg[ed] more interest and fees that are allowed by law without disclosure," "fail[ed] to disclose the re-categorization of the loan" to Miner, "willfully and intentionally misrepresented the nature and character of the loan and concealed his intentions to reclassify the loan," and "represented to [Miner] that the mortgage agreement was in the form of a personal loan and that Defendants' loan offers were financially superior, would benefit Plaintiffs' business interest, and promote the growth of Plaintiff's real estate portfolio." Am. Compl. ¶¶ 48-50. Plaintiffs also allege that Defendants knew or should have

known that such representations were false, that Plaintiffs relied on Defendants' representations as being true, and that as a consequence Plaintiffs suffered financial damages and lost other business opportunities. *Id.* ¶¶ 51, 53, 55.

In the instant motion for summary judgment, Defendants ask the Court to grant summary judgment on this claim on the ground that the allegations of fraudulent misrepresentations in the Amended Complaint do not satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b).[5]

To establish a claim of fraudulent misrepresentation under Missouri law, a plaintiff must prove: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's  intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-32 (Mo. 2010) (internal citations omitted). As both parties recognize, Plaintiffs' fraudulent misrepresentation claim must satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) for claims alleging fraud. *See, e.g., Freitas v.*

---

[5] In their Memorandum in Support, Defendants also state, "The representation that 'the mortgage agreement was in the form of a personal loan' must fail" because it is contrary to the terms of the loan documents. Def.'s Mem. Supp., Doc. 93, at 7. However, Defendants do not explain how this contradiction relates to the elements of a fraudulent misrepresentation claim and do not cite any authority to support granting summary judgment based on this argument. Thus, the Court finds that they have not met their burden of showing that this argument provides a basis for finding that there is no genuine issue of material fact and they are entitled to judgment as a matter of law.

*Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013). Under Rule 9(b), "In alleging fraud . . ., a party must state with particularity the circumstances constituting [the] fraud . . . ." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), the plaintiff "must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Frietas*. 703 F.3d at 439 (quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)). "This particularity requirement demands a higher degree of notice than that required for other claims." *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003). The "higher degree of notice is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotation marks omitted).

As Plaintiffs point out, Defendants' argument that Rule 9(b)'s particularity requirement is not satisfied is an argument more typically made in a motion to dismiss than in a motion for summary judgment. However, the Eighth Circuit has held that "[a] district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b)." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995) (citation omitted). *Accord Mitec Partners, LLC v. U.S. Bank Nat'l Ass'n,* No. 07-CV-2085-LRR, 2009 WL 500618, at *7 (N.D. Iowa Feb. 26, 2009), *aff'd*, 605 F.3d 617 (8th

Cir. 2010).

The Court agrees with Defendants that in the Amended Complaint, Plaintiffs failed to plead the fraudulent misrepresentation claim with the heightened particularity required by Rule 9(b). Plaintiffs do not identify the specific person who made the alleged misrepresentation, instead making vague references to "Defendant" or "Defendants." *See Owen Cont'l Dev., LLC v. Vill. Green Mgmt. Co.*, No. 4:11-CV-1195-FRB, 2011 WL 5330412, at *5 (E.D. Mo. Nov. 4, 2011) ("Generally, the statements alleged to be fraudulent must be linked to an individual speaker. Vague references to 'defendant' as the speaker . . . are insufficient."). Plaintiffs do not allege how the alleged misrepresentations were made, so it is unclear whether they occurred by telephone, in person, or in writing. Plaintiffs also do not identify the date or dates when the alleged misrepresentations were made. From the rest of the Amended Complaint, it appears that the representations must have occurred sometime in September or October of 2017; this, however, this is not sufficiently specific to satisfy Rule 9(b). *See, e.g., Hill v. Bank of Am.*, N.A., No. 4:16CV00444-ERW, 2016 WL 6441599, at *4 (E.D. Mo. Nov. 1, 2016) ("Even if the Court construes this misrepresentation as happening 'in December and January 2010,' pleading a single instance of misrepresentation occurred during a two month time period does not satisfy the particularity requirement of FRCP 9(b)'s 'when' element."). Most importantly, the allegations do not include a description of what Defendants' representatives actually said to Plaintiffs. First, it is not even clear whether the alleged misrepresentations relate only to the mortgage on the Grotto Property or relate to other loans as well. The use of the singular term "loan" and the allegation that there was a representation that "the mortgage agreement was in the form of a personal loan"

13

suggest that the allegations relate to the Grotto Property. However, the allegation that Defendants represented that "Defendants' loan offers [plural] were financially superior, would benefit Plaintiff's business interest, and promote the growth of Plaintiff's real estate portfolio" suggest that Plaintiffs are also making allegations of misrepresentations about the loans on the Rental Properties. This basic lack of clarity demonstrates a failure to plead fraud with particularity. Second, Plaintiffs do not allege that Defendants represented to them that they would receive any particular interest rate or loan terms, do not allege the interest rate or loan terms they had been offered by others, and do not allege the interest rate they were ultimately charged.[6] Defendants also allege no facts to suggest that Defendants knew these statements were false when they were made. Thus, the Court finds that Plaintiffs did not, in their Amended Complaint, satisfy the heightened pleading requirements of Rule 9(b).

In their opposition, Plaintiffs argue that because this is a motion for summary judgment and not a motion to dismiss, the Court is not limited to considering the allegations in the Amended Complaint, but may also consider the statements in the affidavit of Miner that Plaintiffs submitted with their opposition. Neither party directs the Court to any cases addressing how to handle evidence presented in response to a Rule 9(b) challenge at the summary judgment stage. The

---

[6] Although Plaintiffs allege that Defendants represented that their loan offers were "financially superior, would benefit Plaintiff's business interest, and promote the growth of Plaintiff's real estate portfolio," such representations are mere expressions of opinion of "puffing" that cannot provide a basis for a fraud claim. *See, e.g., Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 171 (8th Cir. 1997) ("Representations . . . that compare the efficiency, economy or quality of one product to other products may not form the basis of a cause of action in fraud.") (applying Missouri law); *Love v. Career Educ. Corp.*, No. 4:11CV1585 JAR, 2012 WL 1684572, at *3 (E.D. Mo. May 15, 2012) ("Under Missouri law, mere expressions of opinion or 'puffing' are not actionable representations.").

Court's own research suggests that at least in some cases, Courts have denied a defendant's motion for summary judgment where the plaintiff provided evidence containing the required particularity. *See Denson Int'l Ltd. v. Liberty Diversified Int'l, Inc.*, No. CIV. 12-3109 DSD/JSM, 2014 WL 3361798, at *3 (D. Minn. July 9, 2014) (denying a motion for summary judgment based on Rule 9(b) where the plaintiff had cited documents containing the alleged fraudulent misrepresentations; stating, "[the plaintiff] has adequately identified the source, time and contents of the allegedly-fraudulent representations by [the defendant]. As a result, [the defendant's] argument that summary judgment is warranted based on insufficient pleading is unavailing."); *Milan v. Colvin*, No. CIV. 09-3666 DWF/TNL, 2011 WL 1988205, at *5 (D. Minn. May 20, 2011) ("The Court declines to grant summary judgment on Plaintiffs' fraud count on the basis of Defendants' argument that the Complaint failed to satisfy Rule 9(b). The purpose of Rule 9(b) is to facilitate a defendant's response to and preparation of a defense to charges of fraud. Given the allegations in the Complaint, the fact that Defendants answered the Complaint in December 2009 and did not assert that the allegations were insufficient at that time, and the arguments and supporting affidavits submitted to the Court by the parties in the current motion, the Court respectfully disagrees with Defendants' assertion that it is not reasonably able to respond and prepare a defense to Plaintiffs' fraud claim."). In other cases, courts have granted the motion for summary judgment but have given Plaintiffs (upon request) leave to amend the complaint. *See Waitt v. Speed Control, Inc.*, No. C-00-4060-MWB, 2002 WL 1711817, at *26 (N.D. Iowa June 28, 2002) (granting motion for summary judgment based on Rule 9(b) but granting Plaintiffs' motion for leave to amend; noting that "complaints dismissed under Rule 9(b) are almost always dismissed with leave

to amend").

After review of Miner's affidavit, the Court concludes that even assuming, *arguendo*, that it would be proper to consider this evidence in assessing Defendants' motion, the information in that affidavit still does not contain the particularity required by Rule 9(b). Although the affidavit makes it clear who made the misrepresentations (Schrieber), it still leaves open major questions with regard to when the misrepresentations were made and what their content was.

In the affidavit, Miner identifies two misrepresentations. The first occurred in a September 2017. After Schrieber contacted Miner about possibly providing financing services to him for the five properties at issue, Miner emailed Schreiber to inquire about financing options. Miner also emailed Schreiber information about the terms of a loan offer he had received from USA Mortgage, including the rates offered and the fact that the offer included PMI. Schreiber then called Miner and told him that if Miner used Defendants' services, Schrieber could get rid of Miner's PMI and get Miner lower or better interest rates. Miner Aff. ¶¶ 5-9, 11.

The second misrepresentation occurred in October 2017. Miner states that "Schrieber made representations to [Miner] the day prior to the closing of the properties that [Miner] should go ahead and sign the documents even though there was information in there that was false and [Miner] would later get the deal he had promised [him] orally which had lower interest rates with no PMI." Miner Aff. ¶ 29. Miner alleges that he relied on those statements and that he "ended up paying higher interest rates on the properties than [he] understood [his] deal with Defendant to be and [he] was forced to pay a commercial loan on [his] home at a significantly higher interest rate than a home loan would have been." *Id.* ¶ 31. Miner also alleges that his "payments were higher

16

than they would have been with USA Mortgage on [his] home and [his] rates were higher than Curtis Schrieber had told him they would be in September 2017." *Id.* ¶ 16.

These new statements do not satisfy the requirements of Rule 9(b). Although Miner states that the telephone call occurred in "September 2017," he still does not specify when in September the misrepresentation actually occurred. That omission is particularly significant in light of the evidence submitted by Defendants that on September 25, 2017, Schrieber sent emails to Miner describing loans whose interest rates and monthly payments match those in the loan documents Plaintiffs ultimately signed. Moreover, Miner still does not state what interest rates or payment amounts Schrieber actually offered to Miner, still does not state what interest rates or payment amounts USA Mortgage offered to Miner, and still does not state whether Schrieber said anything about giving Miner a lower interest rate or a different type of loan for his home as compared to the Rental Properties. Miner also offers no facts to suggest that Schrieber knew at the time of the phone call that the interest rates or other loan terms he quoted were inaccurate. With regard to the allegation that Schrieber would get rid of Plaintiff's PMI, Plaintiffs do not state whether the loan agreements they ultimately entered included PMI, so it is not even clear whether that statement was inaccurate at all. Finally, it is still not clear to the Court whether the alleged misrepresentations about getting rid of PMI and giving Plaintiff a higher interest rate are directed to only the Grotto Property or to the Rental Properties as well. Most of Miner's statements in the affidavit suggest that Schrieber's statements regarding interest rates were specifically related to his home loan. *See* Miner Aff. ¶ 9 ("Schrieber at that time told me he could handle my commercial transactions and get rid of my PMI and get me a lower interest rate for a home I was looking to purchase as well";

17

*Id.* ¶ 10 ("I purchased the property at 132 Grotto Ct, Florissant, MO 63033 and later found out what Curtis Schrieber told me was not true regarding the favorable terms of my financing and I was paying higher rates than I had received from USA Mortgage and my personal home was classified as commercial property"); *Id.* ¶ 13 ("After I purchased the home at Grotto I found out that the rate I was paying was in excess of the rate Mr. Schrieber had previously told me I would be paying in September of 2017 when he convinced me to use his services for both my home and commercial purchases"); *Id.* ¶ 16 ("After closing I found out that my payments were higher than they would have been with USA Mortgage on my home and my rates were higher than Curtis Schreiber had told me they would be in September 2017"). However, at other points, Miner appears to be suggesting that he paid higher rates than he had expected on multiple "properties" (plural), suggesting that the misrepresentations related to the Rental Properties as well. *Id.* ¶ 31 ("I ended up paying higher interest rates on the properties than I understood my deal with Defendant to be . . . .").

The Court next turns to the second misrepresentation—that Miner should go ahead and sign the closing documents despite the false statements in them, and it would all be worked out later. First, Miner does not state clearly when this statement occurred. He states that the representation occurred "the day prior to the closing of the properties"; however, there were two closing dates—one for the Rental Properties on October 16, 2017, and one on October 27, 2017 for the Grotto Property. The use of the plural term "properties" may suggest it was the October 16, 2017 closing date. Regardless, this lack of clarity regarding the date of the representation also makes it difficult to determine whether Schrieber's statement was directed only to the closing

18

documents for the Rental Properties or to the closing documents for the Grotto Property (which were signed eleven days later) as well. Again, Plaintiffs have failed to make it clear what transactions the alleged misrepresentations are related to.

In sum, the Court finds that even when Miner's affidavit is considered in combination with the Amended Complaint, Plaintiffs have not alleged the "the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts," as required by Rule 9(b). *United States ex rel. Joshi*, 441 F.3d at 556. They have not provided Defendants the level of notice required to respond "specifically and quickly to the potentially damaging allegations." *Drobnak*, 561 F.3d at 783. Thus, Plaintiff's fraudulent misrepresentation claim will be dismissed.

### C.  Count III: Declaratory Judgment

In Count III ("Declaratory Judgment"), Plaintiffs allege that during the course of their transactions with Defendants, Defendants engaged in unfair or deceptive trade practices, including unfairly placing Miner into a loan for which he would pay higher than the acceptable interest rate for a personal loan; categorizing Miner's loan as a commercial/business loan rather than a personal loan; and failing to provide payoff figures when requested. Am. Compl. ¶ 57. Plaintiffs seek the following: a declaration "that the mortgage on [the Grotto Property] is not legally palatable as it applies commercial interest rate to a non-commercial residential property"; "rescission and reformation of the mortgage covering [the Grotto Property]"; compensatory, consequential, and incidental damages; pre-and post-judgment interest; punitive damages; attorney's fees; and

19

injunctive relief and any other remedy contained in Mo. Rev. Stat. §§ 408.675-408.700.[7] Am. Compl. ¶ 59.

Under Missouri's Declaratory Judgment Act, "Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder." Mo. Rev. Stat. § 527.020. A declaratory judgment action under Missouri law requires the following: "(1) a justiciable controversy that presents a real, substantial, presently-existing controversy admitting of specific relief, as distinguished from an advisory decree upon a purely hypothetical situation; (2) a plaintiff with a legally protectable interest at stake, 'consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief;' (3) a controversy ripe for judicial determination; and (4) an inadequate remedy at law." *Missouri Soybean Ass'n v. Missouri Clean Water Comm'n*, 102 S.W.3d 10, 25 (Mo. 2003) (quoting *Northgate Apartments, L.P. v. City of N. Kansas City*, 45 S.W.3d 475, 479 (Mo. Ct. App. 2001)). "A declaratory judgment 'should be used with caution and, except in exceptional circumstances plainly appearing, it is not to be used and applied where an adequate remedy already exists.'" *Edwards v. City of Ellisville*, 426 S.W.3d 644, 656-67 (Mo. Ct. App. 2013) (quoting *State ex rel. Freeway Media, L.L.C. v. City*

---

[7] Sections 408.675 through 408.700 are known as the "Missouri Right to Financial Privacy Act." Mo. Rev. Stat. § 408.675.1. These provisions appear to relate to disclosures of financial records to the government. Plaintiffs do not explain in their Amended Complaint or in their briefing how these provisions apply to the facts of the instant case, nor is it apparent to the Court.

*of Kansas City*, 14 S.W.3d 169, 173 (Mo. App. 2000)). "Due to the justiciable controversy requirement, a court cannot enter declaratory judgment after an issue becomes moot." *Wyatt v. Liberty Mortg. Corp.*, No. 4:13-CV-00317-DGK, 2013 WL 6730298, at \*4 (W.D. Mo. Dec. 19, 2013) (citing *Jacobs v. Leggett*, 295 S.W.2d 825, 835 (Mo. banc. 1956)).

Defendants argue that they are entitled to summary judgment for two reasons: (1) Plaintiffs' real action is one for breach of contract, so declaratory relief is not available, and (2) the issues in the declaratory judgment are moot, because the mortgage on the Grotto Property has been released, and so there is no document for this Court to rescind or reform.

The Court rejected Defendants' first argument—that declaratory relief is not available because Plaintiffs' real action is one for breach of contract—in its Memorandum and Order denying Defendants' Motion for Judgment on the Pleadings. (Doc. 111). The Court found that Plaintiffs' claim was not actually one for breach of contract, because Plaintiffs did not allege that any contract was breached and did not ask the Court to make a declaration of Plaintiffs' rights under any contract. For the same reasons stated in the prior Memorandum and Order, the Court cannot grant summary judgment on Count III on this basis.

Defendants' second argument is that the action for declaratory judgment is moot because the mortgage on the Grotto Property has been released. Plaintiffs acknowledge in their response that Miner "is no longer in need of reformation of the contract for his residential property." Pl.'s Mem. Opp'n, Doc. 109, at 5. The Court agrees with Defendants that Plaintiffs' declaratory judgment action is moot in light of the release of the mortgage on the Grotto Property.

21

Plaintiffs suggest that the declaratory judgment claim is not moot because they did not just request rescission and reformation, but also requested damages and a declaration that "the [Grotto Property] mortgage is not legally palatable as it applies [a] commercial interest rate to non-commercial residential property." Am. Compl, ¶ 59. However, Plaintiffs do not offer the Court any legal basis for a finding that the mortgage is "not legally palatable," and it is not apparent to the Court how a declaration regarding the legal palatability of the now-released mortgage on the Grotto Property would affect any of Plaintiff's rights or interests. Moreover, to the extent that Plaintiffs contend that they suffered damages as a result of the categorization of the mortgage on the Grotto Property as a commercial loan, Plaintiffs have not offered the Court any basis for a finding that they lack an adequate remedy at law with respect to those damages.

Plaintiffs also argue Count III is not moot because Plaintiffs still have other loans with Defendants, and  "the same problems regarding the payoff amounts are bound to reappear when Plaintiff attempts to sell or refinance the property and therefore the Court may decide this issue before it as it is still ripe with Defendant claiming they owe no duty to provide payoff information in their Motion for Summary Judgment." Pl.'s Mem. Opp'n, Doc. 109, at 4-5. This argument is unpersuasive. In Count III, Plaintiffs do not ask the Court to make any declaration addressing Defendants' duty to provide payoff figures on mortgages. Thus, even if the Court were to enter a judgment granting all of the declaratory relief requested in Count III, such a judgment would have no impact on any possible future controversy over whether Defendants are obligated to provide payoff figures. The Court need not reach the question of whether, if Plaintiffs *had* requested such

22

relief in Count III, the continuing existence of other mortgage loans between the parties would be sufficient to render Count III justiciable, an issue that has not been briefed by the parties.

For all of the above reasons, Defendants' motion for summary judgment will be granted with respect to Count III.

### D.  Count IV: Tortious Interference with Business Expectancy and Contract

In Count IV ("Tortious Interference with Business Expectancy and Contract"), Plaintiffs allege that they had entered into agreements with prospective buyers for two of the Rental Properties[8] and that they told Defendants in September of 2018 that they would need partial releases so that the title companies could close on the sales. Am. Compl. ¶¶ 61-62. They also allege than on October 17, 2018, they requested payoff figures for a sale and closing date of November 12, 2018; that as of November 12, 2018, Defendants had not provided the pay-off figures; that as a result the property could not close in the manner intended; and that on or about November 16, 2018, Defendants provided a payoff quote that was inaccurate and incorrect. *Id.* ¶¶ 26-30. Plaintiffs further allege that after they told Defendants their plans, Defendants began inquiring into the nature of the sales and contacting the title companies to inquire about the nature of the sales; that Defendants contacted the new lending agent and caused the lender to be curious about Plaintiffs' business practices; and that Defendants began to impose conditions upon Plaintiffs that were not warranted, including pre-payment of the note for monthly payments that were not yet due. *Id.* ¶¶ 63-67, 69 They allege that due to Defendants' actions, the closing could not be accomplished

---

[8] The Amended Complaint only mentions two properties; in Miner's affidavit, however, he states that all closings for all four rental properties were supposed to occur on November 12, 2018.

as promised, the contracts for the sale of the properties were substantially impeded, and they lost profits and savings that would have come from accomplishing the sales. *Id.* ¶¶ 70, 72.

Under Missouri law, "a claim for tortious interference with a contract or business expectancy requires proof of each of the following: "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Rail Switching Servs., Inc. v. Marquis-Missouri Terminal, LLC*, 533 S.W.3d 245, 257 (Mo. Ct. App. 2017) (quoting *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017)).

Defendants make several arguments for why they are entitled to summary judgment on this claim, though they do not link any of their arguments to the elements of a tortious interference claim. The Court will address each in turn.

First, Defendants argue that they are entitled to summary judgment because they were not legally required to provide partial releases for encumbered collateral under the terms of the relevant promissory notes or the deeds of trust. They argue that such a requirement would have to be explicitly stated in the documents. This argument is unpersuasive for two reasons. First, this is not a breach of contract claim, it is a tortious interference claim. Defendants do not cite any authority for their suggestion that, in order to show that Defendants tortuously interfered with Plaintiffs' contract or business expectancy, Plaintiffs must show that Defendants' conduct constituted a breach of Defendants' own contractual obligations. Second, Defendants' failure to provide partial releases is only one aspect of Plaintiffs' tortious interference claim; Plaintiffs also allege that Defendants failed to provide timely payoff and accurate payoff figures and took various other

actions that interfered with Plaintiffs' ability to close on the properties.

Second, addressing Plaintiffs' allegation that Defendants failed to provide timely payoff figures and provided payoff figures that were incorrect, Defendants characterize this as Plaintiffs "complaining about not liking the payoff amount," and they argue that Defendants had every justification to provide the title company with a full payoff of the loan. Def.'s Mem. Supp., Doc. 93, at 10. However, Defendants provide no evidence from which the Court could determine whether the payoff figures they provided to the title company to Plaintiffs were correct.

Defendants also suggest that Plaintiffs' tortious interference claim fails because Plaintiffs do not allege that Defendants had contact with the buyers of the properties, but only that Defendants had contact with the title company. They also cite a document showing that they emailed a payoff figure to the title company for one of the properties. They suggest that because their contact with the title company was "collateral to the contract with Buyers," it could not support a tortious interference claim. This argument is unavailing. Defendants provide no authority for their suggestion that a "collateral" communication cannot give rise to a tortious interference claim. Moreover, even if they were correct about that, the communication with the title company is not the only action that Plaintiffs allege in their tortious interference claim.

The Court also notes that Defendants make no arguments with regard to Plaintiffs' allegation that after Defendants heard about the upcoming sale, Defendants began to impose conditions upon the Plaintiffs which were not warranted, including pre-payment of the present note for monthly payments which were not due.

Finally, Defendants argue that Plaintiffs cannot show the requisite intentional interference,

25

because if the closing had not taken place, it was *Defendants*, rather than Plaintiffs, that would have been harmed, because Defendants would not have been paid off. This argument is unpersuasive. Presumably, Defendants entered into the loan agreements with Plaintiffs because they planned to benefit from Plaintiffs' interest payments over the life of the loan, and an early payoff would end that relationship. Moreover, Plaintiffs have alleged that the closing would have benefited them because were attempting to sell the properties, extinguish the mortgage from Defendants, and obtain less expensive financing that would have allowed them to purchase additional properties.

Finally, Defendants argue that the claim is moot, because Plaintiffs did sell the two parcels that are the basis of this claim. However, this is a claim for damages, not injunctive relief, and a claim for damages is rarely mooted by changed circumstances. *Cf.* 13C C. Wright & A. Miller, Fed. Prac. & Proc. Juris. § 3533.3 (3d ed.) ("The availability of damages or other monetary relief almost always avoids mootness . . ."); *Gibson v. DuPree*, 664 F.2d 175, 177 (8th Cir. 1981) ("A viable claim for damages insures the existence of a live controversy appropriate for judicial resolution—at least to the extent of determining whether a claim is stated and a damage remedy is available."). Plaintiffs allege that they lost savings and profits that they would have obtained had they been able continue with the sale of property as planned. Defendants offer no argument or authority to suggest that Plaintiffs cannot recover those damages, and Defendants provide no authority for their suggestion that a tortious interference with contract or business expectancy claim is moot merely because the plaintiff successfully entered some contract that was not the one it originally expected to enter.

26

For all of the above reasons, Defendants have not met their burden of showing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on Plaintiffs' tortious interference claim, and the motion will be denied with respect to Count IV.

### E.  Count V: Punitive Damages (as to Count IV)

Defendants' argument that they are entitled to summary judgment on Count V is entirely premised on their contention that they are entitled to summary judgment on Count IV. Because they are not entitled to summary judgment on Count IV, Defendants' motion will be denied as to Count V.

### IV.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendants Curtis Schrieber  and Mercantile Capital Inc. (Doc. 92) is **GRANTED IN PART and DENIED IN PART**. With respect to Count II (Fraudulent Misrepresentation) and Count III (Declaratory Judgment), the motion is **GRANTED.** In all other respects, Defendants' motion is **DENIED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of July, 2020.